YELLOW JACKET MINING COMPANY *v.* TEGARDEN.

Opinion delivered July 15, 1912.

1. SALES OF CHATTELS—CONSTRUCTION.—In determining the meaning of a written contract of sale, the subject-matter of the sale must be considered.  (Page 580.)

2. SAME—CONSTRUCTION.—Where machinery known to the buyer to be second-hand was sold under a written contract undertaking that it was in first-class condition, the meaning was that the machinery should be in first-class condition as second-hand machinery.  (Page 580.)

3. SAME—IMPLIED WARRANTY AS TO CONDITION.—In a sale of second-hand machinery there is ordinarily no implied warranty as to its quality or condition.  (Page 580.)

4. CONTRACTS—CONSTRUCTION.—No word in a contract should be treated as surplusage if any meaning which is reasonable and consistent with the other parts can be given.  (Page 581.)

5. SALES OF CHATTELS—WAIVER OF WARRANTY.—The taking charge or retention of chattels purchased does not waive the breach of a warranty, whether expressed or implied, nor whether the defect is known or latent.  (Page 581.)

6. SAME—WARRANTY—CONSTRUCTION.—A contract for the sale of certain mill machinery, which provided that the last payment should not be

made if during thirty days the mill was not found satisfactory and free from defects, referred to all material defects, including a breach of its warranted capacity.   (Page 581.)

7.   SAME—BREACH OF WARRANTY—DAMAGES.—Under a contract for the sale of milling machinery which warranted that the machinery would have a capacity of 100 tons daily, and provided that the last payment should be due thirty days after the seller had milled a carload of ore if the mill was then satisfactory and free from defects, and that in case of defects the buyer might remedy them and deduct the cost from the last payment, the buyer, who operated the mill fifteen days before discovering that the mill lacked the required capacity, was not entitled to damages for its failure during that time to mill such capacity. (Page 581.)

8.   SAME—BREACH OF WARRANTY—DAMAGES.—Where a seller warranted that a mill should be in first-class condition as second-hand machinery, the measure of damages on breach of the warranty is the difference between what the machinery would have been worth in a first-class condition as second-hand machinery at the time it was turned over to the buyer and its value in its defective condition, or the cost of putting it in such first-class condition.   (Page 582.)

Appeal from Marion Chancery Court; *T. H. Humphreys,* Chancellor; affirmed.

### STATEMENT BY THE COURT

This is an action instituted by Tegarden Brothers to recover a balance of $4,000 alleged to be due for the purchase money of a concentrating plant constructed on certain land in Marion County, and to enforce a mechanics' lien thereon. No question is raised as to the right to enforce the lien.   The defendant admitted the purchase of the property and that a balance of the purchase money was due thereon, but resisted recovery of the full amount sued for.   It pleaded as a set-off a note for $445.66, and also a counterclaim for damages which it alleged it sustained by reason of the breach by plaintiffs of certain warranties contained in the contract of sale of the property.   It alleged that these damages, together with said set-off, amounted to $3,635.13, leaving a balance of $364.87, for which it offered to confess judgment.

The plaintiffs owned and were operating a concentrating mill, located on land known as White Eagle Mine, in Marion County, and all parts of the mill were second-hand, having been operated for some years.   On October 1, 1910, they sold the mill to the defendant, and agreed to move same to its prop-

erty, known as Philadelphia mine, located in the same county, for the sum of $7,000, to be paid in installments. The sale was evidenced by a written contract. By the terms of said contract, it was provided that "said mill herein conveyed is to be a first-class one of 100 tons daily capacity, and is understood to include all buildings, boilers, engines, pumps, crushers, conveyors, breakers and all other machinery, appurtenances, appliances and tools belonging to and used in connection with the said mill without regard to number, value or amount." The plaintiffs also agreed therein to move the mill and buildings to defendant's property, and there erect and construct same "in a good and workmanlike manner upon the plan of its construction at the White Eagle Mine." They also agreed to furnish certain parts of machinery not included in the second-hand plant, amongst which was a self-feeding hopper.

The contract further provided: "Party of the second part (plaintiffs) further agrees, in order to test the construction of said mill and buildings and as further guaranty of its good condition, to operate the same after it is erected at their own expense until they have manufactured or milled one carload of concentrates ready for shipment. * * * "The party of the first part (defendant) agrees to accept said mill and pay therefor the sum of seven thousand dollars, as follows: $1,000 on the execution of this contract; $2,000 when said mill has been removed and rebuilt on the property of the party of the first part as herein provided, and after it has been operated for such a length of time as to mill a carload of concentrates; $4,000 thirty days after the date of said payment of $2,000, provided at the time said payment of $4,000 is due the mill shall prove satisfactory and free from defects. And, in the event that there should be any defects in the erection of said mill occasioned by the negligence or lack of skill on the part of the parties of the second part, that the parties of the first part shall have the right to remedy such defects, and deduct the cost of the same out of the payment of $4,000."

The defendant is a corporation having its principal office at Helena, and, before entering into the above contract, sent a committee, consisting of five persons, to examine the property. This they did, and, after agreeing on the terms of the purchase, defendant had the contract drafted at Helena and forwarded

to plaintiffs for their execution, which was done. Thereupon, the plaintiffs moved the mill to the Philadelphia mine, and proceeded to operate the mill in order to manufacture the one carload of concentrates in compliance with the terms of the contract. This they did, substantially, by February 4, 1911. During all the time that the mill was being moved and set up, defendant had a representative named McCarty present, who notified it just prior to February 4 that plaintiffs had about milled the carload of concentrates. Thereupon the defendant sent a committee of three persons to examine and take over the property. At that time the plaintiffs had not milled an entire carload of concentrates, but substantially so, and the committee agreed to accept the amount so milled as the required amount, and thereupon made the second payment of $2,000. The plant was then turned over to the defendant, and said McCarty became its superintendent.

The defendant operated the mill from that date until March 24, 1911. It is claimed by defendant that during that time its superintendent discovered a number of defects in various parts of the machinery, and notified it thereof. Thereupon it sent a special representative to examine the property, who did so on March 24, 1911. There is a conflict in the testimony as to whether or not plaintiffs were notified of the alleged defects prior to that date. However, on that day defendant's said representative stated to plaintiffs that there were a number of defects in the machinery, and in the erection of the mill, and specified same. The defendant then refused to pay the last installment of $4,000, but it continued to operate the mill until the latter part of June, 1911. In the meanwhile, plaintiffs instituted this suit on April 7, 1911.

In August, 1911, the defendant had extensive repairs made in the plant, and in doing so purchased various parts of new machinery. The defendant alleged that it paid for work and labor and material for making repairs and for the new parts of machinery the total sum of $2,203.13, and that all of these were necessary to place the plant in a first-class condition and to obtain 100 tons daily capacity.

It also alleged that, during the thirty days that it tested the mill to ascertain the condition of the machinery, it operated it for fifteen days before making discovery of its failure to come

up to the required capacity, and on that account it was forced to and did operate it for said fifteen days at a loss of $50 per day, which it asked to recoup as damages. It also claimed that during the time that plaintiffs operated the mill after its removal, in order to manufacture the one carload of concentrates, they used a number of cords of wood belonging to defendant, of the value of $220, for which they asked recovery.

The plaintiffs admitted that defendant was entitled to credit for said note, but denied all items of the counterclaim.

The testimony of a number of witnesses was introduced by both parties relative to the condition of the various parts of the mill and as to the capacity thereof. This testimony was conflicting. Upon the part of the defendant it tended to prove that certain parts of the machinery, especially the rougher and cleaner jigs, were decayed in parts and leaked; that plaintiffs had endeavored to repair them at the time they moved the mill, but that the repairs were not effective, and that these defects reduced the mill's capacity. This testimony also tended to prove that there were defects in the elevators, pulleys, hopper and other parts of the machinery, as well as in the foundation, and the manner in which the mill was erected; that the mill, by reason of these defects, did not have a capacity of exceeding one-half the required 100 tons daily capacity, and, in order to remedy the defects and obtain said capacity, it was necessary to make the repairs and purchase the new parts of the machinery. It introduced in evidence an itemized statement of the amounts paid by it for work and material and parts of machinery, which amounted to said sum of $2,203.13.

The testimony on the part of the plaintiffs, however, tended to prove that the mill, when turned over to plaintiffs on February 4, had a capacity of 100 tons daily, and that, if it did not come up to that capacity when operated by defendant, this was due to the inefficiency of its superintendent. This testimony also tended to prove that, while parts of the jig were decayed, plaintiffs had repaired same so that they were in good condition; that, except in a few minor parts, all of the machinery was in first-class condition as second-hand machinery; that the defects if any, were slight, which could be remedied at a small expense. There was also a great conflict in the

testimony as to the amount necessary to pay for each of the parts of the plant which were claimed as defective.

Upon the final hearing of the case, the chancellor held that by the terms of the contract the plaintiffs sold the mill to the defendant, with the warranty "that they would remove and reconstruct it in a workmanlike manner, so that when erected it would be a first-class second-hand mill, complete in every detail and free from defects meaning of course material defects, and of 100 tons daily capacity;" and that the defendant was entitled to recover damages for "all material defects in the entire mill and in the erection thereof." He found that when the mill was turned over to defendant it was not constructed so that it had a capacity of 100 tons daily, and that this was due to material defects in the machinery and the erection thereof. He further found that defendant proceeded to operate the mill for a period of four months after the termination of the thirty days given to it by the contract in which to determine whether the mill was free from defects, before it repaired and reconstructed the plant; that "the use and operation of the mill in its defective condition for so long a time would thus greatly injure the mill;" and he found that it would be inequitable and unjust to allow the defendant the entire cost of said reconstruction. He thereupon made a finding as to each item of the machinery which was defective, and as to the defects in the erection of the mill; and also found the separate amount of the damage to which defendant was entitled by reason of each of these defects. The total amount of the damages thus found amounted to $496.01. He also found that defendant was entitled to recover for the wood used by plaintiffs during the time they operated the mill, and that this amounted to the value of $125. He allowed these damages on the counterclaim, and also the amount of said note as a set-off. After deducting these sums from said $4,000, the court rendered a decree in favor of plaintiffs for the balance thereof.

From this decree both parties have taken an appeal. The plaintiffs have appealed from the allowance of the damages for the alleged defects in the machinery and the value of said wood. The defendant has appealed because the court failed to allow the full amount expended by it in repairing and reconstructing the mill, and also because it refused to allow any

damages for the loss claimed to have been incurred for the fifteen days on account of the failure of the mill to have the required capacity.

*Moore, Vineyard & Satterfield,* for appellant.

1. The court erred in holding that the capacity of the mill could be ascertained in one day's use, and that the use of the mill by the appellant after the thirty days' test and while it was in an apparent defective condition would injure it so that it was impossible to ascertain the extent of the defects at the end of thirty days' test.

2. It was error to hold that appellant was estopped from recouping the entire cost of reconstructing the mill and cutting down the amount or amounts expended for the different items of repairs in rebuilding the same.

3. It was error to disallow appellant's claim for damages on account of loss of profits while the mill was being operated during the period of thirty days immediately subsequent to the time it was turned over to appellant by the appellees, and during which time it was operated to test the mill and ascertain whether or not it was free from defect.

Appellant's counterclaim is a legal right, and the doctrine of laches does not apply. 70 Ark. 371; 88 Ark. 395; 89 Ark. 19; 96 Ark. 540. See also 79 Ark. 506; 71 Ark. 408; 91 Ark. 427.

*Sam Williams* and *S. W. Woods,* for appellees. ·

1. The contract having been drawn in the absence of appellees by the attorney of appellant, if it is susceptible of two constructions, it will be construed in the light most unfavorable to appellant that its terms will admit. 73 Ark. 338; 74 Ark. 41; 90 Ark. 256; 97 Ark. 522.

The court will also, in construing the contract, take into consideration the situation of the parties and the subject of the contract. 90 Ark. 277; 97 Ark. 522.

2. If it had been the intention of the parties that the mill should be first-class in every detail, and as good as a new one, as contended by appellant, they would have rested on the general statement that ''said mill herein conveyed is to be a first-class one of one hundred (100) tons daily capacity,'' instead of going into detail and specifying all that appellant was to have.

3. Appellant's claim that it was damaged in the operation of the mill in the loss of profits is inadmissible, as too remote and speculative.    57 Ark. 203.

FRAUENTHAL, J., (after stating the facts).    We are of the opinion that the construction which the court placed upon the written contract is correct.    The subject-matter of the contract of sale was a lot of machinery and appurtenances, constituting a concentrating mill which had been operated for several years.    Before purchasing the property, defendant sent its representatives to examine same, which they did.    It was second-hand property, and so known to defendant when it bought it.    In determining the true meaning of this contract, it is necessary not only to take into consideration each of its parts, but also the subject-matter of the sale.    In the contract it is provided that the "mill herein conveyed is to be a first-class one."    This, we think, was a warranty of the condition of the property sold.    It is not provided, however, that the machinery shall be new, but only that the mill shall be a first-class one.    The property purchased was second-hand, and therefore by this provision it is clearly meant that the mill and its parts should be in a first-class condition as second-hand machinery.

Ordinarily, in the sale of second-hand machinery, there is no warranty as to the quality or condition of the property unless expressly made.    *Hartin Comm. Co.* v. *Pelt*, 76 Ark. 177; *J. I. Case Threshing Machine Co.* v. *Bailey*, 89 Ark. 108.

But, by the above provision of the contract, we think that the mill, though second-hand, was warranted to be in first-class condition.    In the contract it is provided that, in order to test the construction of the mill and buildings, "and as further guaranty of its good condition," the plaintiffs would operate it until they had milled one carload of concentrates. It is urged by plaintiffs that the act of the representatives of defendant in taking over the property on February 4, after plaintiffs had milled the above carload of concentrates, was an acceptance of the property and an approval of the condition of the mill, and that thereafter plaintiffs were only liable for defects in the erection thereof.    This contention is also made on the ground that in the contract it is provided that, "in the event that there should be any defects in the erection of said mill occasioned by the negligence or lack of skill" of plain-

tiffs, that defendant should have the right to remedy the defects therein and deduct the cost thereof from the purchase price. But the contract must be read as a whole. It is a familiar rule of construction that no word in a contract should be treated as surplusage and disregarded if any meaning which is reasonable and consistent with the other parts thereof can be given. The contract should be construed so that each part should take effect. *Earl* v. *Harris,* 99 Ark. 112; *Doniphan, Kensett & Searcy Rd. Co.* v. *Mo. & N. Ark. Rd. Co., ante,* p. 475.

It manifestly appears from the contract, taken as a whole, that the plaintiffs were to furnish every part necessary to constitute a complete plant, ''so that the said mill when erected should be complete in every detail." And it is provided therein that, after the taking over of the property and the payment of $2,000, the defendant should have thirty days in which to test it, and that the payment of $4,000 should then be made, provided ''the mill shall prove satisfactory and free from defects." The taking charge of or retention of the property purchased does not waive the breach of a warranty, whether express or implied, nor whether the defect therein is open and known or latent. *Weed* v. *Dyer,* 53 Ark. 155. So that the mere taking over of the property and the operation thereof by defendant did not waive its right to any damages growing out of a breach of the warranty that the machinery was in first-class condition as a second-hand mill. The provision that the $4,000 was not payable if, during the, thirty days, the mill should not be found satisfactory and free from defects clearly applies to all defects, and to the fact that the mill would not be satisfactory in event it was not of the warranted capacity. The court was therefore correct in holding that plaintiffs were liable for all damages arising from material defects in every part of the mill.

The court found that when the mill was turned over to the defendant it was not so constructed that it had a capacity of 100 tons daily. It is contended by defendant that it operated the mill for fifteen days while making the test before discovering that the mill did not have the required capacity. It therefore urges that the court erred in not allowing to it damages for the loss arising during that time from the failure of the plant to mill the warranted quantity of ore. But we think that it clearly appears that this was not one of the elements of damages

contemplated by the parties or provided for by the contract. The defendant was given the right to test the mill for the period of thirty days in order to see if it was satisfactory and free from defects. The mill itself, with its twenty-four inch rolls and other parts, was one which had, according to the testimony of J. H. Klinefelder, one of defendant's principal expert witnesses, a 100-ton daily capacity, and he testified that "if properly put in, they will make that much dirt." J. L. McCarty, defendant's superintendent, testified that the capacity of the mill was reduced by reason of defects in the jigs, elevators and other parts of the machinery, as well as in the manner in which it was erected. The repair of these defective parts would bring the mill, therefore, up to the warranted capacity. It is not provided in the contract that defendant should recover any damage for any loss occurring during the period it was making the test by reason of any failure of the mill to reach the warranted capacity; but in the contract it is provided that the defendant might remedy any defects discovered, and deduct the cost from the purchase price. The existence of the defects, therefore, was the element warranting recovery of damage to which defendant was entitled in case of breach of the contract, and the measure thereof was either the difference between the value of the parts in a first-class condition as second-hand machinery and in their defective condition, or the cost of putting them in a first-class condition. There was no testimony showing the value of the various parts of the mill in their defective condition, nor the value thereof in a first-class condition. The testimony adduced was directed entirely to the condition of the various parts and the cost of placing same in a first-class condition. The testimony is conflicting, both as to the various parts of the machinery which were defective and the cost of remedying the defects. The chancellor appears to have examined this testimony carefully, and thereupon made a finding in which he specified each item of the property which he found was defective, and the cost of putting each of said items in a first-class condition. We have examined the testimony as searchingly as we are able to do, and after fully considering it we are unable to say that the chancellor erred in his findings as to the parts which were defective and the damages to which the defendant is entitled

by reason thereof. The defendant operated the mill in its defective condition for four months after it had obtained knowledge of such defects, and thereafter repaired and reconstructed it virtually as a new mill. It bought many new pieces of machinery to replace parts of the second-hand machinery which it still retained. Some of the parts could have been placed in first-class condition as second-hand machinery at much less expense than the cost of new parts and other parts, notably the new rolls purchased, were larger and more costly than the second-hand rolls. The second-hand rolls, with slight if any expense, could have been placed in proper condition as second-hand machinery. The contract warranting the condition of the property only related to it at the time when it was turned over. It did not cover the condition of the property after it had been operated for four or five months beyond that date. The contract provided for a recovery only of the cost of remedying the defects and placing the second-hand machinery in a first-class condition. and this necessarily referred to the time the mill was turned over to defendant, or at the furthest to the time when the defects were discovered by it. *Haskell* v. *Sevier,* 25 Ark. 152; *So. Engine & Boiler Wks.* v. *Globe C. & L. Co.,* 90 Ark. 482; 35 Cyc. 414.

After as careful an examination of the testimony as we are able to make, we can not say that the findings of the chancellor as to the parts which were defective, and the damage arising therefrom, are contrary to the weight of the evidence. It follows that his findings must stand, and that the decree should be affirmed. It is so ordered.